IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE APPLE iPhone WITHIN THE CUSTODY OF THE PHILADELPHIA POLICE DEPARTMENT AND ASSOCIATED WITH JULIAN KNIGHT | Case No. 24-MJ-1421 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
UNDER RULE 41 FOR A SEARCH WARRANT**

I, Richard Antonini, being duly sworn, do hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a warrant to search the contents of the Apple iPhone within the custody of the Philadelphia Police Department (SUBJECT PHONE), which was recovered by the Philadelphia Police Department pursuant to the March 12, 2024, arrest of Julian KNIGHT, date of birth: 12/01/2001, of 2304 South Watkins Street, Philadelphia, Pennsylvania for Violations of the Pennsylvania Uniformed Firearms Act.

2.      I am a Task Force Detective with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Violent Crime and High Intensity Drug Trafficking Area (HIDTA) Enforcement Group, Philadelphia Field Division and have been since 2017. Prior to my current assignment, I was assigned to a specialized investigative unit (SIU) as a detective within the Philadelphia Police Department, where I focused on violent crime patterns and investigations. I have been employed with the Philadelphia Police Department since 1999 and have been involved with various aspects of policing to include plainclothes assignments, narcotic enforcement teams (NETS), and uniformed patrol. As part of my current assignment, I am tasked with investigating violations of federal law, including commercial robberies, carjackings, home invasions, drug offenses, kidnappings, and other violations of federal law. Additionally, I have obtained

1

numerous Pennsylvania state and federal search and seizure warrants relating to criminal investigations. I am familiar with analyzing social media evidence, phone extractions, and other forms of digital evidence derived from subpoenas and search warrants. Further, I have attended external training pertaining to cellular phone mapping analysis. I have attended electronic surveillance "wire" school for the state of Pennsylvania and achieved my "A" certification (#A-6181). I have graduated from the Philadelphia Police Academy and obtained a bachelor's degree in criminal justice from St. Joseph's University.

3. I am currently assigned as a Taskforce Detective (TFO) to ATF Group VI, Violent Crime and "HIDTA" Taskforce in the Philadelphia Field Division, whose primary mission is to investigate those individuals and groups that are engaged in the commission of violent/ narcotics state and federal violations. During my law enforcement career, I have received training regarding violations of state and federal law. I have conducted or assisted with investigations of violent crime as well as violations of state and federal firearms and narcotics laws which include analyzing cellular phone data. I have used digital and social media related evidence to further criminal investigations. Through my experience, I know that individuals involved in criminal activity often use a cellular device to send messages containing information about their crimes, including, but not limited to, photographs of instrumentalities and/or fruits of their crimes such as firearms, and communications regarding their criminal activity with others who may have associated with them in their criminal endeavors. Additionally, I know through experience that individuals involved in criminal activity often use social media platforms such as Instagram and/or other messaging platforms, to communicate with others about their criminal activity and these applications are often installed on their cellular devices.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

5.      Because this affidavit is submitted for the limited purpose of obtaining search warrants, I have not included all information known by me, other agents, or other law enforcement officers concerning this investigation.  I have set forth only those facts I believe are essential to establish the probable cause for the search warrant.  This affidavit does not exhaust my knowledge or that of other agents and law enforcement officers of the facts and circumstances surrounding this investigation.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that Julian KNIGHT, FBI number 742537RD2 committed violations of 18 U.S.C. § 922 (g) (1) felon in possession of a firearm. There also is probable cause to search the information described in Attachment A, for evidence of this crime as further described in Attachment B.

**JURISDICTION**

7.      This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is a "district court of the United States (including a magistrate judge of such court) . . . that has jurisdiction over the offense being investigated[.]" 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

8.      On March 12, 2024, Philadelphia Police Officers John Smart and Mark Minissale were on duty and operating an unmarked police vehicle while dressed in full uniform. They were

3

equipped with body-worn cameras.  Officers Smart and Minissale were conducting surveillance around the area of 23rd and Tasker Streets, which was conducted in part by utilizing a Philadelphia Police Department, Real Time Crime Center "RTCC" remote recording device. During their surveillance, which started around 6:20 PM, the officers observed a male identified as Julian KNIGHT standing on the sidewalk. During their surveillance, the officers' reported KNIGHT was not moving around as much as the other males who were standing with Knight. They also observed KNIGHT standing unnaturally very rigid and appearing more as a "lookout" aware of his surroundings. When KNIGHT did walk around, it was very limited.  Based on their training and experience, they believed that KNIGHT might be armed with a firearm. Furthermore, the officers also knew about KNIGHT's criminal history, which involved arrests and convictions for firearms offenses. The officers also knew this area to be a "high crime" area.

9.     Your affiant obtained a copy of the RTCC footage from this incident.  Based on my review, it appears that KNIGHT was standing on the sidewalk for approximately twenty (20) minutes before he departed the area. KNIGHT was also captured on video surveillance utilizing what appears to be a cellular phone.

10.     When KNIGHT was standing on the sidewalk area, he was wearing a gray hooded sweatshirt and an orange winter hat on his head.  KNIGHT had the hood of his hoodie up at times. Included below is a screenshot from the RTCC video, depicting KNIGHT on March 12, 2024.

 

*Screenshots from the RTCC video footage, depicting KNIGHT*

11.     The officers observed KNIGHT enter what appeared to be the driver seat of an already parallel parked Mazda SUV, later determined to bear Pennsylvania registration MJV-9482. Shortly after KNIGHT entered the vehicle, the driver door closed, and approximately a minute later, the vehicle pulled out of the parking spot and drove away.

12.     The officers confirmed that KNIGHT did not have a driver's license or a permit to carry a firearm by conducting record checks through the use of their police vehicle's mobile data terminal (MDT) and continued their surveillance.  Following the departure of KNIGHT, the officers relocated to the area of 22nd and Morris Streets, where they continued physical surveillance of KNIGHT in the Mazda. The officers observed KNIGHT for approximately 10-15 minutes, as he was positioned in the driver's seat of the Mazda SUV and was backed into a parking spot of the Wow Food Market. Ultimately, the officers observed KNIGHT depart from this area northbound on 22nd Street.

13.     Having observed KNIGHT's continued operation of a motor vehicle on a public roadway while not properly licensed, the officers activated their lights and sirens to initiate a traffic stop.  However, the vehicle did not stop. According to the officers, KNIGHT was traveling at a rate of speed faster than the street speed limit.

14.      Upon approaching 1500 South 24th Street, the officers observed KNIGHT make a wide turn and strike a parked car. After he struck a parked car, KNIGHT opened the Mazda driver's door and exited the vehicle, running on foot from the officers.  Included below is an image of the vehicle that KNIGHT was operating.



*Screenshot from RTCC depicting the Mazda leaving the area of 23rd and Tasker Streets*

15.     Upon fleeing on foot, officers observed KNIGHT reach towards his right waistband area and grab a firearm from his waistband. Based on his proximity to KNIGHT, Officer Minissale observed KNIGHT discard a black firearm under a vehicle parked nearby.

KNIGHT was detained following a short foot pursuit and taken to the ground.  During the pursuit, KNIGHT lost one of his shoes.

16.     Officers observed and recovered the firearm that KNIGHT discarded under a Honda SUV parked nearby. The discarded firearm was found under the vehicle and just feet away from the shoe that KNIGHT lost during the foot pursuit.

17.     The firearm recovered was determined to be a black Springfield Armory, loaded with a total of eight rounds of ammunition, bearing serial number S4928468. The firearm was retained as evidence and placed on PPD property receipt number 3655426.

18.     During the incident, the officers recovered KNIGHT's cellular phone and keys, which were on the ground next to KNIGHT. KNIGHT's cell phone was identified as an Apple iPhone. The iPhone was placed in "airplane mode". The officers turned over KNIGHT's cell phone to members of PPD's South Detective Division.

19.     Following this incident, KNIGHT was charged with violations of Pennsylvania Uniformed Firearm Act (VUFA) and related offenses. During the course of the federal investigation, the firearm recovered pursuant to KNIGHT's arrest was determined to be manufactured outside the state of Pennsylvania. The firearm KNIGHT possessed during his arrest was traced by the ATF to the original purchaser who was located in Fairmount, North Carolina. The date of sale was determined to be in April 2015. As previously mentioned, the officers were wearing body-worn cameras at the time of this incident. Their body-worn cameras captured KNIGHT's iPhone being recovered, which is depicted by a screenshot below. Additionally, KNIGHT was observed using his cell phone on the RTCC video. A screenshot from the RTCC video also is included below.



*Screenshots from RTCC and officer body-worn camera, respectively.*

**<u>Pennsylvania Search and Seizure Warrant</u>**

20.     During the course of the Philadelphia PD investigation, South Division's

Detective Christopher Maitland of (SDD) obtained a Pennsylvania search and seizure warrant

(#24-003361) in April 2024, for the contents of the KNIGHT's Apple iPhone. Following the

issuance of this warrant, and with assistance of the Philadelphia District Attorney's Gun

Violence Taskforce, detectives executed the warrant and produced a phone extraction for

KNIGHT's device, which was provided to Detective Maitland. I believe that  the local search

warrant would withstand federal scrutiny; however, in the abundance of caution, I am applying

for a federal search warrant to search the SUBJECT PHONE, including the extraction or

download of said device by Philadelphia Police Department. Your affiant has not reviewed the

cell phone extraction provided by Detective Maitland. In his search warrant affidavit of probable

cause, Detective Maitland included information about KNIGHT's previous firearms arrests and

convictions.

8

**Criminal History and Additional Information**

21.     KNIGHT has been arrested four (4) times for violations of the Pennsylvania Uniform Firearms Act. On October 30, 2019, KNGHT was arrested by the Philadelphia Police Department and charged as a juvenile for Possession of a Firearm by a Minor (Misdemeanor of the First Degree), Possession of a Firearm with Manufacturer's Number Altered (Felony of the Second Degree), Firearms Not to be Carried Without a License (Felony of the Third Degree), and Carrying Firearms in Public in Philadelphia (Misdemeanor of the First Degree).  KNIGHT was adjudicated delinquent on Possession of a Firearm by a Minor and Possession of a Firearm with Manufacturer's Number Altered.[1]

22.     KNIGHT was subsequently arrested on July 6, 2021 by the Philadelphia Police Department for another firearms case.[2]  He was charged with Possession of a Firearm with Manufacturer's Number Altered (Felony of the Second Degree), Firearms Not to be Carried Without a License (Felony of the Third Degree), Possession of a Firearm Prohibited (Misdemeanor of the First Degree), and Carrying Firearms in Public in Philadelphia (Misdemeanor of the First Degree).  KNIGHT was convicted on all charges.[3] KNIGHT received a sentence of 11.5-23 months imprisonment with 4 years' probation running consecutive to the

---

[1] CP-51-JV-0001911-2019.

[2] This arrest occurred in the area of 2100 Tasker Street which is located in South Philadelphia. The firearm recovered by the Philadelphia Police Department in conjunction with this arrest was determined to be a 9mm Taurus pistol with an obliterated serial number.  This firearm was ballistically linked to a shooting incident that occurred on 1500 South Napa Street, where fired cartridge casings were left behind.  This shooting incident occurred several months prior to KNIGHT's arrest and the firearm's recovery.  The incident generated NIBIN Crime gun ID #766-22-000490. NIBIN is the National Integrated Ballistics Information Network, which compares ballistic evidence from various shooting incidents to link crime events.

[3] CP-51-CR-0008133-2021.

expiration of his parole. KNIGHT was immediately paroled upon his sentencing on August 18, 2022.

23.     KNIGHT was arrested for firearms offenses on November 10, 2022[4] in Delaware County.  He was charged with Possession of Firearm Prohibited (Felony of the First Degree), Firearms Not to be Carried Without a License (Felony of the Third Degree), and other related charges. KNIGHT plead guilty to Possession of a Firearm Prohibited and Firearms Not to be Carried Without a License.[5]  KNIGHT was sentenced to 11.5-23 months imprisonment with 5 years' probation running consecutive to the expiration of his parole. KNIGHT was released on parole in November 2023.

24.     KNIGHT's juvenile adjudication and adult convictions make it illegal for him to possess a firearm under state and federal law.  KNIGHT's first three firearms arrests occurred prior to KNIGHT's twenty-first birthday, such that he legally would not have been able to purchase a handgun in Pennsylvania nor have a license to concealed carry a firearm. KNIGHT has been legally precluded from having a firearm under Pennsylvania law since his juvenile adjudication, thus even though he was twenty-two at the time of his most recent arrest, KNIGHT still would not legally be able to purchase, possess, or concealed carry a firearm.

25.     As previously mentioned, KNIGHT was arrested on March 12, 2024, by the Philadelphia Police Department.[6]  This March 2024 arrest occurred approximately five (5) months after his release on parole and involved yet another different firearm. Over the span of less than four and a half years, KNIGHT has possessed at least four (4) different firearms that

---

[4] KNIGHT was on parole for approximately less than three (3) months before he incurred a new arrest for a firearms related offenses.

[5] CP-23-CR-0001593-2023.

[6] Officers Smart and Minissale first observed KNIGHT in the area of 23rd and Taskers Streets in South Philadelphia, which is approximately 2 blocks away from where KNIGHT was arrested in 2021 for firearms related offenses.

law enforcement has recovered.  All of KNIGHT's arrests have involved firearms. KNIGHT's

repeated firearms arrests during a relatively short period of time, including an even shorter

period of time between dates of conviction and release on parole, demonstrates that KNIGHT

has the ability to access and acquire firearms.

26.     I know from my training and experience that persons prohibited from possessing

firearms often will come into possession of firearms illegally. Because they legally cannot

purchase a firearm from a Federal Firearms Licensed dealer, they must resort to other methods to

obtain their firearms.

**Probable Cause to Search the Cellular Phone
for the Items and Information Described in Attachment B**

27.     Based on my training and experience, I know that individuals involved in criminal

activity commonly utilize their cellular telephones to communicate with co-conspirators or

associates to facilitate, plan, and execute crimes. I know these communications are by phone and

messaging.  Suspects use a variety of applications to communicate with confederates.  By

reviewing messages stored within the phone, we may identify previously unknown conspirators.

These messages often record previous communications involving the illegal activity and other

illegal activity. For example, I know that individuals engaged in criminal activity often store

contacts lists, address books, calendars, photographs, videos, audio files, text messages, call logs,

created notes, voicemails in their electronic devices, such as cellular telephones, to be used in

furtherance of their criminal activities.

28.     Specifically, I know that those involved in criminal activity communicate with

associates or co-conspirators using cellular telephones to make telephone calls, leave voicemails

and voice memos, and send text messages. Cellular telephones contain a storage feature,

detailing recent calls (incoming and outgoing) or missed calls.  In my experience, learning the

11

recent communications (voice or text) just prior to an arrest provided evidence beneficial to an investigation.  This information can lead to the identification of co-conspirators related to their illegal activities.  I am aware that Apple-based phones download voicemail messages and store them on the phone itself so that there is no need for the user to call in to a number at a remote location and listen to the message. In addition, I know those individuals who participate in criminal activity communicate with associates or co-conspirators using cellular telephones to send e-mails and text messages and communicate via social media networking sites such as Instagram and Facebook, or messaging applications such as Whatsapp. By analyzing call and text communications, I may be able to determine the identity of the person(s) who sold or provided KNIGHT the Springfield semi-automatic handgun recovered by Philadelphia Police. This information could be useful to determining how KNIGHT came into possession of a firearm that was first purchased in North Carolina.

29.    Further, I know that cellular phones may also be used to facilitate the payment of goods (such as firearms), or to send cash to co-conspirators, using mobile payment applications such as CashApp and Venmo. Such applications often leave a trail of identifying information such as emails, phone numbers, names, and bank account information.

30.    Furthermore, cellular telephones also contain address books with names, addresses, photographs, and phone numbers of a person's regular contacts.  I am aware that individuals who participate in criminal activity frequently list associates or co-conspirators in directories, often by nickname, to avoid detection by others.  Such directories as the ones likely contained in the subject cellular telephone, are one of the few ways to verify the numbers (i.e., telephones, pagers, etc.) being used by co-conspirators or associates.

31.     In addition, based on my training and experience and the training and experience

of other agents and Task Force Officers, I know that those who participate in illegal activity,
such as the illegal possession of firearms and ammunition, often take photographs and/or video
of themselves with their firearms and ammunition using their cell phones.  They also will retain
those photos and videos on said cell phones.  Additionally, I know that prior to coming into
possession of a firearm and ammunition, people often will receive photos and/or video of said
firearm and ammunition from other individuals who are looking to sell or trade said firearm and
ammunition. These photos and video are often accessible on the receiving device.

32.     Based on my training and experience, those who commit these crimes often store
these items on their phones in order to show to associates, send to prospective buyers, and/or to
upload to social media at a later date. Further, cellular phones and other electronic devices may
be used to research the price and availability of certain firearms.

33.      Furthermore, based on my training and experience and the training and
experience of other agents and Task Force Officers, I know that individuals who participate in
criminal activity often use their cellular phone's Internet browser for web browsing activity
related to their activities. I know that individuals will conduct internet searches on their cell
phones of the make, model, and caliber of their illegally possessed firearms.

34.     Furthermore, based on my training and experience, forensic evidence recovered
from the review of a cellular telephone can also assist in establishing the identity of the user of
the device, how the device was used, the purpose of its use, and when it was used.  In particular,
I am aware that cellular telephones are all identifiable by unique numbers on each phone,
including: serial numbers, international mobile equipment identification numbers (IMEI) and/or
electronic serial numbers (ESN).  The search of each phone helps determine the telephone
number assigned to each device, thus facilitating the identification of the phone as being used by

individuals engaged in criminal activity.  In addition, I am aware that by using forensic tools, information/data that users have deleted may still be able to be recovered from the device.

35.     Searching for the evidence described in Attachment B may require a range of data analysis techniques.  In some cases, Agents, taskforce officers, computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be co-mingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, the ATF intends to use whatever data analysis techniques appear necessary to locate and retrieve the potential evidence described in Attachment B.

36.     Your Affiant therefore believes and asserts that a search of the electronic files and memory of the **SUBJECT PHONE** stored on a 128 GB drive may yield evidence of violations of federal laws, including, but not limited to, disclosing the identities of persons involved in the commission of these offenses, such as who may have provided the firearm to the prohibited person, when the firearm was first obtained, and the method and means used to obtain the gun. KNIGHT legally cannot purchase or possess a firearm. Based on my training and experience, I know it is common for prohibited persons to purchase firearms "on the street" which they often arrange via cell phone. As described above, I also know that prohibited persons also take photos

and videos of themselves with their firearms and ammunition, using their cell phones, and that these photos and videos are accessible on the cell phone. Because KNIGHT has consistently had access to illegal firearms over the past four and a half years and had access to the firearm recovered on March 12, 2024 (which was approximately five months after his release on parole), I believe that the **SUBJECT PHONE** contains evidence showing the where, when, who, and how KNIGHT came to possess this firearm.

37.     Therefore, based on the information, facts and circumstances stated above, your Affiant believes that **SUBJECT PHONE** could provide investigators with additional information related to the investigation of Julian KNIGHT.  Accordingly, I respectfully request that the Court issue a warrant that includes permission to search the **SUBJECT PHONE**, for the information sought in attachment B utilizing methods outlined in the affidavit.

<u>TECHNICAL TERMS</u>

38.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its
current location.  It often contains records the locations where it has been.  Some
GPS navigation devices can give a user driving or walking directions to another
location.  These devices can contain records of the addresses or locations involved
in such navigation.  The Global Positioning System (generally abbreviated "GPS")
consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an
extremely accurate clock.  Each satellite repeatedly transmits by radio a
mathematical representation of the current time, combined with a special sequence
of numbers.  These signals are sent by radio, using specifications that are publicly
available.  A GPS antenna on Earth can receive those signals.  When a GPS
antenna receives signals from at least four satellites, a computer connected to that
antenna can mathematically calculate the antenna's latitude, longitude, and
sometimes altitude with a high level of precision.

e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used
for storing data (such as names, addresses, appointments or notes) and utilizing
computer programs.  Some PDAs also function as wireless communication devices
and are used to access the Internet and send and receive e-mail.  PDAs usually
include a memory card or other removable storage media for storing data and a
keyboard and/or touch screen for entering data.  Removable storage media include
various types of flash memory cards or miniature hard drives.  This removable
storage media can store any digital data.  Most PDAs run computer software,
giving them many of the same capabilities as personal computers.  For example,
PDA users can work with word-processing documents, spreadsheets, and

17

presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.      Internet: The Internet is a global network of computers and other electronic

devices that communicate with each other.  Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

39.     Based on my training, experience, and research, I know that the SUBJECT

PHONE has capabilities that allow it to serve as a wireless telephone, digital camera, portable

media player, and GPS navigation device. In my training and experience, examining data stored

on devices of this type can uncover, among other things, evidence that reveals or suggests who

possessed or used the device.

<u>ELECTRONIC STORAGE AND FORENSIC ANALYSIS</u>

40.     Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can

sometimes be recovered with forensics tools.

41.     *Forensic evidence*.  As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the SUBJECT PHONE was used, the purpose of its use, who used it, and when.  There is

probable cause to believe that this forensic electronic evidence might be on the SUBJECT

PHONE because:

a.      Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of a file

(such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

42.   Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the

device to human inspection in order to determine whether it is evidence described by the warrant.

43.     Manner of execution.  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

44.     I submit that this affidavit supports probable cause for a warrant to search the cellular phone described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

*/s/ Richard Antonini*
Richard Antonini
Taskforce Detective
Bureau of Alcohol, Tobacco, Firearms, and
Explosives (ATF)

Subscribed and sworn to by telephone
in accordance with Fed. R. Crim. P. 4.1
on September 03, 2024.

_____
HONORABLE PAMELA CARLOS
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

## PROPERTY TO BE SEARCHED

The Apple iPhone within the custody of the Philadelphia Police Department and associated with Julian Knight (**SUBJECT PHONE)** and the 128 GB storage drive, containing extraction or download of the **SUBJECT PHONE,** provided by Philadelphia Police Department to Affiant.

**ATTACHMENT B**

**PROPERTY TO BE SEIZED**

1. From the **SUBJECT PHONE,** all records relating to violations of 18 U.S.C. § 922 (g) (1) felon in possession of a firearm and ammunition from February 1, 2024 to March 12, 2024.

a. Records, to include videos, photos, images, messages, notes, e-mails, messaging applications, data, metadata, web search and other browser data, relating to firearms and ammunition and the acquisition of such items.

b. Electronic communications relating to firearms, ammunition, and firearms accessories.

c. Evidence indicating the device owner's state of mind as it relates to the crime(s) under investigation.

d. Information relating to the identities of person(s) who communicated with the subject account user about matters relating to firearms or firearms acquisition.

e. Telephone or address directory entries consisting of names, addresses, telephone numbers; logs of telephone numbers dialed; telephone numbers of incoming, outgoing, or missed calls; text/picture messages; videos; social networking sites; and digital photographs pertaining to the crime(s) under investigation.

f. Any information related to sources of firearms, including names, addresses phone numbers, and any other identifying information.

g. All bank records, checks, credit cards, credit card bills, account information, and other financial records relating to the illegal acquisition of firearms.

h.  Stored memoranda; stored text messages; stored electronic mail; stored photographs; stored audio; and stored video relating to firearms and firearms acquisition.

i.  Evidence of the times the device was used.

j.  Records of or information about Internet Protocol addresses used by the device.

k.  All documents, to include in electronic form, and stored communications including contact information, text messages, call logs, voicemails, Internet searches, and any other electronic data or other memory features contained in the device described in Attachment "A" and SIM cards including correspondence, records, opened or unopened e-mails, text messages, and Internet history, pertaining to the offense under investigation.

l.  Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "Favorite" web pages, search terms that the user entered into any Internet search engine, and records or user-typed web addresses, as well as evidence of the posting of videos, photos, or any material relevant to these crime to any social networking site.

m.  During the course of the search, photographs of the **SUBJECT PHONE** may also be taken to record the condition thereof and/or the location of items therein.

n.  Evidence and contents of logs and files on the item described in Attachment "A," such as those generated by the computer's operating system, which describes the history and use of the device, including but not limited to files indicating when files were written, were opened, were saved, or were deleted. Also, any malware resident on the computer/phone or device.

o.  Any information pertaining to the acquisition, possession, or purchase of the illegal; firearm(s) that was transmitted, stored, or received using the applications or means described in paragraphs above.

Evidence of user attribution showing who used or owned the **SUBJECT PHONE** at the time that the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.